The third case today is No. 21-1519 and No. 21-1520 United States v. Eclis Nieves-Diaz. At this time, would counsel for the appellant please introduce himself on the record to begin. Good morning, Your Honor. May it please the Court, Iwan Sato is on behalf of the accused, Nieves-Diaz. Before I start matters, may I ask for your remit for revoking? You may. Thank you. This case concerns a chip, drugs, and bullets. There was no gun. For possessing these items, Nieves-Diaz was sentenced to a total of one hundred and two months. This court should make these assumptions for three main reasons. First, the court incorrectly calculated the guidelines. It held that a chip by itself qualified as a firearm and applied a higher base offense level, even though chips are excluded from the definition of firearm under that guideline. Secondly, the court misapplied an enhancement to the guidelines, alleging that the bullets were possessed in connection with another felony offense without showing that connection on the record. Thirdly, the court outwardly varied from the guidelines based on the preface that the chip was the same as a fully functioning automatic weapon. The court also failed to justify the reasons why the possession of a machine gun, in this case just a chip, would warrant a higher sentence than what the guidelines recommend. Now, a plain reading of the guidelines, in this case which is 2K2.1, leads to the conclusion that chips alone do not meet the definition of a firearm or applying a base offense level of 22. 2K2.1 has a definition, a section in Abolition No. 1 that includes the term firearm, and that definition states that firearms shall have the meaning given to that term in 18 U.S.C. section 921.83. Now, chips are not considered firearms under section 921.83, and the government claims that because the offense level states that firearms, that is described in 26 U.S.C. 58.5a, the court must apply the definition in 921.83 with 58.5a. So why is it wrong? Because the guidelines don't make that specification, Your Honor. When you look at the definition section for firearm, it doesn't say except as expressly provided in subdivision a, the guidelines shall have the term, the meaning given to it in 921.83. And the commission could have chosen not to include a definition for the term firearm. There is a general definition in 181.1, but the commission specifically chose to define firearm for that guideline section. It could have also, when defining firearm, could have chosen to reference 58.5a, but it did not. It only alludes to 921.83. And what does 8.3 say? Doesn't it just say firearm? No, Your Honor. It has a specific definition of what firearm means, and a machine gun or a piece or part that is designed to convert a semi-automatic firearm into a fully automatic firearm is not included within 921.83. And I think that this is not disputed by the government in any way, that 921.83 does not include the chips, the box switches in this case. So you have to consider that definition, whatever that term is used in the guideline. It's basic statutory principles for interpretation. I understand your textual argument, counsel, but why would the commission want to draw that line? Well, you pointed to us that the Justice Department had asked the Sentencing Commission to change the definition and clarify this format. From a district judge's perspective on how should I sentence this person, why does it make sense to draw that line? Well, I believe there's two reasons for that, Your Honor. And first, from an assessment of culpability standpoint, which I think is what you're alluding to, Judge Hamilton, is that if you look at the Skylights, this is a tiered system, right? You have to look at the facts of the case and assess what level of culpability I'm going to assign to it to determine what punishment that offence shall receive. So if you look at what we're talking about here, chips by themselves cannot cause harm. They have to be used in conjunction with a firearm to actually cause harm to someone else. And if you compare it with a semi-automatic firearm, a handgun, a normal traditional handgun, that in itself should warrant a higher level of culpability because that can readily be used to cause harm. And then a modified block then goes above that, which is why it would trigger a higher base offence. So I'm not advocating for 5845A to be ignored in this case. It has to be considered when applying the base offence level 22. But also the definition of the term firearm has to be respected and paid attention to because otherwise that definition would be superfluous in this case. So the government is asking the court to ignore 921A3 for purposes of applying that base offence level. And also, Your Honor, the second reason why I say it is important is because if we ignore that definition of firearm for purposes of the base offence level, then you would have an inconsistent approach when applying this guideline. Because then you would have one definition for the base offence level, which then you ignore 921A3, and then you would have a chip that would be, in essence, more culpable than a semi-automatic firearm. But then for the purposes of applying the enhancements, you would not consider that chip as culpable as a semi-automatic firearm. And then you wouldn't be able to apply a number of firearms enhancements, the firearm trafficking enhancements, and the possession in connection with another felony offence attempt. It's embarrassing that the same reason, if you're right, that one would distinguish between a chip and a firearm for the in-connection enhancement is a reason why the commission might have treated a chip and a firearm differently for the guideline that we're now talking about. Can you repeat the question, Your Honor? Is the idea that the same logic that underlies your argument, the why for the in-connection with enhancement, they distinguish between a chip and a firearm? Yes, Your Honor. Is the same logic that would justify a distinguish between a chip and a firearm for purposes of the guideline? Yes, because if otherwise, then the court would have to judge— So there's a way in which just having a firearm is more dangerous, emboldening, and threatening to others than having a chip. Exactly, Your Honor. Exactly. And that's why it doesn't refer to Pen B-45A when you're talking about these enhancements. So does this chip serve any purpose other than to modify a semi-automatic handgun? No, Your Honor. From what I understand from reading the patent that is included in the government's sentencing memorandum on Article 28 at this court level, that's the only purpose that it would serve. But it's not just about, you know, how this could possibly be used in the future. It's about how— Right, but it was— The judge starts saying, a fellow who's got drugs, bullets, and a chip might well wonder, why does he have these things? He described it as a coincidental possession. I'm curious about why this defendant was in possession of these three categories of items. Well, Your Honor, you know, he was involved in drug transactions. Obviously, that's not any secret in this case. He played guilty to Account 3. I don't have an answer of why he was possessing these items. There's—I think we— But a judge might want to know. He might be curious. Sure, but that—the government—but that—I think that would be an argument as to why the variance was imposed more so than why the guidelines were calculated, they were calculated in this case. And I'd like to touch upon the second error, the four-level enhancement, if I may. One thing that I want to emphasize, Your Honor, is the fact that the enhancement was— Just on that, to clarify that one. There's no suggestion, even by the government, that if there was an erroneous guidelines calculation, it was harmless, or is there that suggestion? I'm not aware that they'd say that it was harmless because, obviously, an error in the guidelines calculation— Well, I mean harmless because the nature of the conduct was such that the variance would have been the same even without the guidelines calculation being wrong. No, I'm not— That's not an argument. I don't think that that was an indication, Your Honor, no. And obviously, there's a material difference in what the guidelines would have been calculated as because there's a difference of six levels in this case between the base offense level and the enhancement. So going into the enhancement, Your Honor, we have to emphasize that this enhancement was applied on the basis of ammunition. It's in the PSR— This was objected to below. Yes, Your Honor. Yes, both the base offense level and the enhancement were objected to, so we're at the noble review before this court. And the application note for this enhancement, which was created in 2006 to clarify how the court is supposed to view the possession in connection with another felony offense enhancement, only has a presumption based on close proximity when you're talking about a fire, drugs, and evidence of drug trafficking. Now, as I said before, there's no dispute here that there was evidence of drug trafficking. Drugs were found in the apartment where Iznayel was arrested, but there was no fire in that apartment. So there cannot be a presumption of a connection between the bullets and the drugs just based on their close proximity. There needs to be more. And this is where we point to the Fifth Circuit case in Eden, where they indicate that the government must establish specific facts that demonstrate that the ammunition facilitated or had the potential to facilitate the drug trafficking offense. And the government— I'm sorry, are you saying that without the presence of an actual gun, that these two items could never be ruled as facilitated? No, that's not what I'm saying at all, Your Honor, and I think that holding Eden is that ammunition alone can facilitate, but what I'm saying is that you can't presume it based just on close proximity. You have to establish that connection. The government has the burden of demonstrating that connection through the specific facts of the case. And what about the fact that it was visible? Sure, Your Honor, and I was just getting around to that. The government says it was in plain sight, and that's short of what is required to establish that connection. The first thing I should say is that it was in plain sight only in the sense that it was not hidden in a drawer or a closet because it was placed on top of a kitchen cabinet in a corner of the apartment. But the language in Eden illustrates this point, and it says that ammunition has the potential to facilitate the trafficking operation when it is displayed or brandished in a manner that has the potential to embolden the trafficker and protect his operation by implying that he has a gun. So that requires just more than plain sight. The Third Circuit states that for ammunition to have such a deterrent effect on potential threats, it would, among other things, inter-alien, be necessary that it be in plain sight to purchasers or others involved in trafficking. And there's no evidence of that on the record. If you look at the search warrant… So by plain sight, that's how I understand it. All we know is whether if I looked up at the cabinet, I'd see it there, not that if I'm in the room, I'd see it on a shelf? Yes, Your Honor, and I think you're referencing the photograph in the reply briefing, page 4. That photograph… Can I continue, Your Honor, my answer? Yes. If you focus on that photograph and on the diagram in page 6 of the reply briefing, you can see first with the photograph that it was taken by a police officer during the execution of the search warrant in front of the cabinet while looking up at it. And if you see that, that he's inside of the house, and you can still… It's difficult to tell that that's a bag of ammunition just by looking at the picture. And if you look at the diagram, you can also see that the location of that ammunition was in a corner that would not have been visible from the outside or from the entrance, which, according to the search warrant affidavit, is where all the transactions took place. So all the evidence on the record points to the conclusion that it would not have been visible to the people that were conducting these transactions with the defendant. Thank you. Thank you. Thank you, counsel. At this time, if counsel for the government will please introduce himself on the record to begin. Good morning. Greg Conner for the United States, and may it please the Court. The government is asking this Court to affirm, first, because the district court did not clearly care in applying the enhancement, and second, because the district court provided a sufficient justification for the 13-month upward variance. Now, first, by way of preview regarding the enhancement, the government makes two arguments. One is our primary argument that has persuasive authority regarding the enhancement, and the second is our backup argument, which we make in the alternative. The primary argument is regarding the potential facilitation of the ammunition with the drug trafficking, and the fallback argument is the machine gun conversion device with the drug trafficking. Now, as far as the potential for the ammunition to facilitate drug trafficking, there are a few key facts, and I do want to take issue with some of the descriptions that my colleague on the other side just gave. You can look at the photos and the diagram from the government's sentencing memorandum, which he then puts in his reply brief, and see that there is a diagonal straight line between the doorway and the corner of the kitchen where the ammunition is displayed. So it's not, as was just suggested, tucked into a corner. You can see there is a corner on the kitchen cabinet, and that's only possible on the wall that, again, is diagonal to the right if you're looking from the doorway. He also failed to mention to the district court and now an appeal that two of the transactions took place in the doorway, and the description of the ammunition throughout the district court proceedings was always that it was in plain sight. So we think at this stage it's too late to contest the fact that you would be able to see the ammunition from the doorway. Now, not only do we have the doorway transactions, but we also don't think that's dispositive. Just so I follow, was there a contention? Because one of the issues is whether anybody below, in the argument for the application of the enhancement, thought it mattered whether it was being displayed. Okay, what the probation officer said and what the government said, and I'll get to the circuit cases, both said that it was in plain sight, and it therefore could provide notice to a would-be threat to the drug supply. It's not as developed off-brand. The circuit courts in the Fifth and Sixth Circuit go through a more thorough analysis, but both said that because the ammunition, both the probation officer and the AUSA, said because the ammunition was in plain sight… Did they say it could give notice or would give notice? Would give notice. They said would. I don't recall. The wording they used is the wording from the enhancement, the potential. I don't recall if they said would. But what I want to point out, because there's some back and forth about whether or not there's a circuit split or agreement between the Fifth and Sixth Circuit, they do address this enhancement slightly differently, but the overlap is the potential notice when the ammunition is in plain sight. So we think that the enhancement was not clearly erroneous based on either of those decisions' reasoning. And the Sixth Circuit in Coleman is probably applying a more forgiving standard. They say there's also some consideration of the potential facilitation by emboldening the drug distributor to know that he's one step closer to a fireable firearm. So we think that it's under both… That theory doesn't require any showing of it being displayed, the first theory. The theory you just articulated, that you're one step closer. Well, the Sixth Circuit points to two considerations, both the emboldenment and… No, the fact that you're emboldened by the mere fact that it puts you one step closer, independent of whether anybody can see it. That's what I thought that theory was. I don't read the Sixth Circuit as having viewed both in isolation. They said the reason it can… Suppose in the Sixth Circuit view, if it was in a locked closet, wouldn't they say the enhancement applies? Yes, I believe, because they said both considerations… Because it emboldens you, knowing you have it, independent of whether anybody can see it. I don't read them as going that far, because… If it's in a locked closet, nobody can see it. So you're saying if they didn't hold, that if it was in a locked closet, the enhancement would apply? That's not my understanding of the holding, because both were true in that case. So in other words, the drug distributor is emboldened, and the purchaser is impacted because the drug distributor is emboldened? Yes. I think more or less yes. It's both the knowledge of the distributor and the signal to the would-be threat to the supply. In the Sixth Circuit case, but it was on the top shelf of the closet. Is that right? Where was it in the Sixth Circuit case? There's a dissenting opinion in the Sixth Circuit case, and the reason for the dissent was that whatever the potential visibility of that thing was, the dissent's point was even if ammunition can do it when it's displayed, there's no indication it was in that case. Isn't that the point of the dissent? Again, I can't recall this. My recollection of what the dissent was saying is that there's a difference between an unloaded firearm and the signal that can present, and ammunition alone and the signal that can present. And at least the dissent in the Sixth Circuit would disagree also with the Fifth Circuit in saying that ammunition can send that signal to a would-be threat that this person is probably armed. So again, even under the Fifth Circuit opinion, which is more limited in when the enhancement will apply, we think there was no clear error because the… This is the dissent in the Sixth Circuit. This is not to say that possession of ammunition alone could never facilitate another felony offense. It could apply to possession of a loan, for example, where two conspirators plan to rob, say, a bank with one being the gun and the other bringing ammunition for the gun. In that hypothetical, the one possessing the ammunition could clearly be found to facilitate the crime. So I don't think we're taking the view that you never could have it the same in that particular circumstance of the case at hand. It wasn't the evidence of it being a connection just by being present there. Okay, and I trust your reading of that case. Again, we're asking the court to apply the majority opinion and the Fifth Circuit's reasoning. So in order for Nieves to win on this enhancement issue, we think he would have to show by both of those – both reasoning, both decisions were flawed. And we don't think he can do that. Now, as an alternative argument, we have also argued that the conversion device has the potential to facilitate drug trafficking. Now, Nieves filed a 28-J letter regarding the Department of Justice's position in 2K21 regarding auto sears. And he is making that point for purposes of his base offense level argument, but that's not what the letter is saying. And the inconsistency or gap that both the letter and the case law talks about is not about the base offense level, which is specific. It's about the – how to conduct the remainder of the calculation. The base offense level is clear. Are you saying that we should think about the chip in the sand when we think about ammunition as far as facilitating? Well, not in the exact same manner, but I don't think Nieves can have it both ways. His argument is either that firearm parts, ammunition, and a chip have no purpose, which would, again, disagree with the Fifth and Sixth Circuit, without a firearm, and also say that all of these just happen to be in the same small apartment for no reason. If there was no purpose – and this gets to Judge Hamilton's question – if there was no purpose, if this was all coincidental, then you wouldn't be able to explain why all of them were in the same apartment. And you have the context of him being a former drug trafficker who used firearms. But there are two aspects of this emboldenment idea. One of the distributors emboldened and the other one essentially said it strikes the heart of the other person. Would somebody looking at a chip even know what it was if it weren't in Detroit? I think it's unlikely that they would, but that doesn't cut against the point that Nieves is really making, that you only have these auto-sears to put into the back of a pistol to fire a machine gun. Let me just make sure I understand just a technical point. This is now the idea that the in-connection enhancement applies because of the chip. With the potential to facilitate – That requires the chip being a firearm for the in-connection enhancement, correct? Not ammunition. That's correct. And that's the gap – I thought there was a problem with concluding that the enhancement treats, as a firearm, a chip. Even if you're right on the guideline for the defense level, treating a chip as a firearm, which your opponent contests, what's the basis for thinking that a chip can be a firearm for purposes of the in-connection with enhancement? The start of the guideline calculation is based on the conversion device being a firearm. And our argument is that the enhancement says – Just take me through the text in the text of the enhancement. It says, any firearm. And what we argued in our brief, and this is the position of the department in the letter he attached – Does it refer to what kind of firearm, where would we get the definition of a firearm in the application note? The enhancement does not. The application note does. And when it refers to that, isn't it referring to something that excludes a chip? Yes. So why would we read firearm, undefined, in the enhancement you're talking about? With an application note saying firearm means, firearm is defined in the statute that excludes a chip, such that the enhancement for the in-connection with is referring to a firearm that is a chip. And our argument in the alternative is that when it says any firearm, that should include the offense of conviction and what sets the base offense level. So the application note has to be disregarded because it's inconsistent with it? Yes, and that is the gap. That's what I'm trying to present as the gap between the base offense level and the remainder of the calculation. That's what the letter identifies, the Hickson case from the Northern District of Illinois identifies. There is a problem that the commission did not consider that the base offense level would be different than the firearm for the rest of the case. Why isn't the solution here? And that seems to say, look, we've got this textual problem with the interaction of different statutory and guideline provisions. The commission is going to have to fix this. The district judge in a particular case may quite reasonably decide, I really don't care about that difference. But in this case, we don't have such a statement to that effect. Instead, we've got this textual thing, which I frankly find at best a toss-up. And the commission will have to straighten things out. Why not send this back to the district judge to basically explain why he would or would not care about the correct textual analysis of this provision, given the combination of the codes, the shooting gun, the conversion device, and a lot of the analysis? Okay, two things. The first is what you're referring to as a possible district court stance. That's what took place in the Hickson case, which is what the letter he attached refers to. As far as this case. Judge Johnson in that case works in a circuit that encourages district judges to say exactly that. And we admittedly don't have that statement here. However, that's why we make our primary argument regarding the ammunition and the drug distribution. And there's persuasive, out-of-circuit legal authority on that, and we think it's the most straightforward way to resolve the enhancement issue. And then as a fallback, our position is that the conversion device also has that potential. But if I'm understanding you, if we were to reject, you're saying we must resolve the textual issue, because if we resolve it against you, we have to vacate. I'm saying the only reason to get to the textual issue is if you address the Fifth and Sixth Circuits and disagree with their reasoning because it's non-binary. And then if we did that, and then we got to the textual issues, if we have to resolve it on your account, because we have to vacate if we disagree with them. Yes, and that's where I point the court to the use of any firearm. Just the flip side of your position is if we don't disagree with you, we have no basis. If you find the Fifth and Sixth Circuit decisions compelling and applicable to these facts, you have no reason to get to that. And if we don't, and we get to it, we cannot vacate if we buy your alternative argument that the firearm is a chip. That's correct. And if I could just briefly address the variance issue. Nieva's argument makes the point that the district court equated this with any other modified block case and said that the chip is just as dangerous as those cases, and therefore, that's why it was imposing the variance. That is not true. If you look at the transcript that focuses on the history and characteristics of this offender, he has a series of violations, pre-trial violations, violations during incarceration, supervisory release violations, and he's a two-time drug trafficker. And the district court determined that he had displayed an utter disregard for the law, which is the exact justification this court sanctioned in Bella's ending. Mr. Conner, with my colleagues indulgence, one quick question. I believe this is the case in which the judge said he thought the guidelines treated a snub-nosed revolver just as they would a machine gun. I didn't get the specific reference to that. Do you know what he was talking about? I don't. I think he was engaging… I assume the guidelines were discriminating among different kinds of firearms in many ways. Right, but this was a back-and-forth long after the sentence was imposed, and he was explaining why, on a more broad scale with my opposing counsel, why he has a problem with these machine gun cases. Are there specific references where there… do you know of any guidelines that would treat a five-shot with a snub-nosed revolver as a machine gun? Not that I'm aware of, other than I think he's referring to 5845. I thought he was saying that the guideline was tagged to a statutory definition of the offense, and that offense, when it defines what the firearms encompassed are, include within it not just machine guns but also snub-nosed revolvers. So what he's saying is the commission is the same guideline for both types of weapons. I believe you're correct. Okay, but if that's what he was saying, what I didn't follow is how do we know that means the guideline is too low? Wouldn't it also be possible it's too high for a snub-nosed revolver? Well, a district court in its discretion could… No, but he has to have a reason for saying the guideline should therefore… it should go up. And the only way we would know that is if we knew by including both it was too low. And he never explains why he's thinking it's too low rather than too high. So it doesn't seem like much of a reason, disregarding… If that was the reason in this case that he justified the variance, we would have to engage in that more. But it's not in this case. That is after my opposing counsel asked for reconsideration, and there's a back-and-forth regarding this case and others. It's not the justification he gave for the upward variance. And if there are no other questions, we'll rest on it. I'm not following that. Once they ask for reconsideration because they're objecting and you say the guideline is specific and a back-and-forth follows, why wouldn't we consider the other reasons that the court expresses when you further explain why it's not going to be considered? I don't think that's exactly what happened, Judge Thompson. What happened is there was an accusation. You're doing this frequently in the aggregate in a lot of machine gun cases, and the district court explained why it had problems with these offenses. Again, talking about a group of cases, that is not – this is justification for the variance. This is one of the cases in the group. Okay, that's fair, but I don't think that is the district court providing the explanation for this variance. It's during the 3553A analysis. Thank you. Thank you, counsel. At this time, counsel for the appellant would please reintroduce himself on the record. He has a three-minute rebuttal. Good morning, Your Honor. I'd like to start by discussing a little bit about the enhancement that you were discussing with my colleagues. So if you look at the – because the government is making this argument that you would use the fallback as the chip for establishing the connection. The court does not make the connection based on the chip. It plainly states when it's pronounced in sentence, and I'm reading from page 75 of the appendix. Because Mr. Nieres possessed ammunition with the knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, the possession was intended to be a controlled substance that's charged in count three. The base offense level is increased by four-eleven. There's no mention of the machine gun conversion device. Sometimes we infer what the district court was relying on based on the arguments that were made by the parties. When the government made their argument of the application of the enhancement, do we have any sense of what their case law that they were relying on was? Were they pressing the Sixth Circuit view versus the Fifth Circuit view? In other words, if the PSR says it was in sight, could have been seen by the person, then it may be fair to infer that the district court relied on that factual finding to apply the enhancement. If instead the government argued the reason you can apply the enhancement is simply that if you have it, it's the same thing as if you have a gun, that obviously would mean we'd have less reason to think the district court necessarily was relying on the factual finding. The problem is that the government never asked for the PSR to be amended, Your Honor. But in arguing for the application of the enhancement, did they cite any case law or anything or no? They cited Coleman, which employs the fortress theory, Your Honor, which I think was what you were discussing, which the fortress theory basically establishes a close proximity. So on that basis, if we were just looking at the arguments and the PSR together, it really wouldn't be clear from just what the district court did whether it was relying on legal error or a potentially legitimate factual basis. Well, I think that they established that the court concluded that it was based on the ammunition, not the firearm, not the machine gun conversion device in this case. What I'm saying is we wouldn't know in deciding that the ammunition was in connection with it. It's hard to tell what the rationale for that was that led the district court to do it. Well, even if you concede that the government relied on the government, I still think that it's insufficient. And I want to go into the facts of Coleman, Your Honor, because I think it would illustrate this point. Because even though they employ the fortress theory, which takes out of the window the facts, specific facts of what happened, in Coleman there was a domestic violence complaint and the police were called to the house. Your Honor, may I finish the question? And when they arrived at the house, in the living space, they find a mirror with a single bullet placed on top of it, marijuana residue, and marijuana baggies. Now, if there was evidence that drug trafficking occurred in that living space, that single bullet placed on top of that mirror purposefully, that may be able to lead to a reasonable inference that that was purposefully placed there to imply that the person has a gun. But that's not what happened here. There was no drug transaction occurring inside of the household, and there's no evidence that anybody else saw that. Could you just address the significance textually of the reference to any firearm? For your point that the application notes reference to a definition of a firearm as an exclusive chip is governing when the text refers to any firearm. And we know that a firearm can be a chip under some definition. Well, Your Honor, it simply would go against basic statutory interpretation. I mean, if there's a definition, you have to use it. And it's not just me saying it. Even the Department of Justice is saying it when they submitted that DOJ letter requesting that the definition of firearm be amended to include the FDA 45A because they can see that it doesn't include it and that those chips are not considered as firearms. Otherwise, why would they make that indication in that letter to the commission? Which leads you to know also, Your Honor, that the commission is aware of these chips and the modified blocks because the definition on 5845A has been there since the National Firearms Act was amended, I think, in the 1980s, even before the gun was created. Thank you. Thank you, counsel. That concludes argument in this case.